EVELYN V.; Hubert B.; Roberta S.; Jill B.; Daniel H.; and Sara R., individually and on behalf of all others similarly situated, Plaintiffs,

v.

KINGS COUNTY HOSPITAL CENTER; Bernard Rose, as Executive Director of Kings County Hospital Center; New York City Health and Hospitals Corporation; J. Emilio Carrillo, as President of the Board of Directors of the New York City Health and Hospitals Corporation; The Board of Directors of the New York City Health and Hospitals Corporation; Cesar Perales, as Commissioner of the New York State Department of Social Services; and Lorna McBarnette, as Acting Commissioner of the New York State Department of Health, Defendants.

No. CV 91–1108 (RR).

United States District Court,
E.D. New York.

April 21, 1993.

The Legal Aid Society, New York City, by Jean T. Schneider, Constance P. Charden, Susan Sternberg by Jane E. Booth, Leah Hill, Civil Appeals & Law Reform Unit, Brooklyn Legal Services Corp. B, Brooklyn, NY by Jane Greengold Stevens, Lauren Shapiro, Timothy Bradley, Cardozo Bet Tzedek Legal Services, New York City by Toby Golick, for plaintiffs.

O. Peter Sherwood, Corp. Counsel for the City of New York, New York City, by Robert Katz, Muriel Goode–Trufant, for defendants Kings County Hosp., Bernard Rose, New York City Health and Hospitals Corp., J. Emilio Carrillo, and The Board of Directors of the New York City Health and Hospitals Corp.

Robert Abrams, Atty. Gen. for State of NY, New York City by Susan Watson, for defendants Cesar Perales and Lorna McBarnette.

Mary Jo White, U.S. Atty., E.D.N.Y., Brooklyn, NY, by Richard Goldstein, Asst. U.S. Atty., by Linda Ruiz, Office of General Counsel, Department of Health and Human Services, for amicus curiae Secretary of Health and Human Services.

## MEMORANDUM and ORDER

RAGGI, District Judge:

Kings County Hospital Center, its director Bernard Rose, the New York City Health and Hospitals Corporation, its Board of Directors, and the President of its Board, J. Emilio Carrillo, (referred to collectively herein as "the City defendants"), move to dismiss that portion of plaintiffs' proposed class action brought under 42 U.S.C. § 1983 (1988), for violations of Title XIX of the Social Security Act, more commonly referred to as Medicaid. 42 U.S.C. § 1396 *et seq.* (1988 & Supp. III 1991).[1] The Commissioner of the New York State Department of Social Services, Cesar Perales, and the acting Commissioner of the New York State Department of Health, Lorna McBarnette, (referred to collectively herein as "the State defendants"), have not joined in this motion. At issue is whether hospital patients can maintain a § 1983 action against the City defendants for alleged violations of Medicaid. Having carefully considered the submissions of the parties, as well as a brief filed by the Secretary of Health and Human Services, as amicus

curiae, in support of the City defendants' position, the court hereby grants the motion to dismiss.

### *Factual Background*

#### A. *Kings County Hospital Center*

Kings County Hospital Center (referred to herein as "Kings County Hospital" or "the Hospital"), which is operated by the New York City Health and Hospitals Corporation, is one of the largest municipal hospitals in the United States, and the primary medical care provider for hundreds of thousands of low-income people in Brooklyn. Founded in 1831 as a one-room infirmary, it now admits as many as 37,000 patients each year, treating another 800,000 as part of its outpatient program. On average, 400 people per day seek assistance at the Hospital's emergency room. *See* Mireya Navarro, *Treating AIDS: One Hospital's Struggle,* N.Y. Times, Nov. 11, 1991, at A1.

#### B. *The Medicaid Program*

Many patients seeking treatment at Kings County Hospital are financially dependent upon the federal Medicaid program for the care they receive. Medicaid, which was enacted in 1965, does not require the federal government itself to provide health care. Instead, it finances approved state health care programs, thereby

> enabl[ing] each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care.

42 U.S.C. § 1396 (1988).

In order to participate in the Medicaid program, a state must submit a health care

---

1. The motion does not address that part of plaintiffs' complaint alleging that Kings County Hospital discriminates against patients infected with the Human Immunodeficiency Virus ("HIV"), in violation of Section 504 of the Rehabilitation Act,

29 U.S.C. § 794 (1988 ed. & Supp. II 1990), and denies them equal protection in violation of the Fourteenth Amendment to the United States Constitution and various state laws.

plan to the Secretary of Health and Human Services (referred to herein as the "Secretary" or "HHS"). *Id.* To be approved, that plan must comply with 58 conditions set forth in 42 U.S.C. § 1396a (1988 & Supp. III 1991). The Secretary is further empowered to set standards of review for hospitals providing care under either an approved Medicaid or Medicare plan. *See* 42 U.S.C. § 1395x(e)(9) (1988) (empowering Secretary to set such standards for Medicare providers); 42 C.F.R. § 482.1(a)(3) (1992) (hospitals participating in Medicaid program must meet standards for participation in Medicare). These are detailed at 42 C.F.R. § 482.1 *et seq.* (1992).

## C. *Plaintiffs and their Complaint*

Plaintiffs are six individuals who are eligible for Medicaid assistance and who have, on various occasions, sought treatment at Kings County Hospital. They claim that the Hospital routinely fails "to provide necessary, adequate, and timely care" to its patients. Complaint ¶ 214. Plaintiffs submit that the Medicaid statute, as well as various federal regulations and state laws and rules, guarantee their right to such care.

In their complaint, plaintiffs point to three subsections of 42 U.S.C. § 1396a ·as the source of their right to "necessary, adequate, and timely care." The first, § 1396a(a)(9), requires a participating state to make the health care agency administering its Medicaid plan "responsible for establishing and maintaining health standards for private or public institutions" serving Medicaid patients. The second, § 1396a(a)(19), requires a participating state to "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." Finally, § 1396a(a)(13), commonly referred to as the Boren Amendment, requires in subpart (A)— a clause that defies diagramming if not comprehension—that a participating state provide

> *for payment* (except where the State agency is subject to an order under section 1396m of this title) of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan *through the use of rates (determined in accordance with methods and standards developed by the State* which, in the case of nursing facilities, take into account the costs (including the costs of services required to attain or maintain the highest practicable physical, mental, or psychosocial well-being of each resident eligible for benefits under this chapter) of complying with subsections (b) (other than paragraph (3)(F) thereof), (c), and (d) of section 1396r of this title and provide (in the case of a nursing facility with a waiver under section 1396r(b)(4)(C)(ii) of this title) for an appropriate reduction to take into account the lower costs (if any) of the facility for nursing care, and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs and provide, in the case of hospital patients receiving services at an inappropriate level of care (under conditions similar to those described in section 1395x(v)(1)(G) of this title) for lower reimbursement rates reflecting the level of care actually received (in a manner consistent with section 1395x(v)(1)(G) of this title)) *which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards* and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each hospital, nursing facility, and intermediate care facility for the mentally retarded and periodic audits by the State of such reports.

42 U.S.C. § 1396a(a)(13)(A) (1988) (emphases added).[2]

Relying on the reference in § 1396a(a)(13) to "applicable State and Federal laws, regulations, and quality and safety standards," plaintiffs cite a host of other federal and state statutes and regulations, which they claim are not being complied with at Kings County Hospital, thereby depriving them of "necessary, adequate, and timely care." Plaintiffs claim that they are denied:

(1) adequate emergency room care, in violation of 42 U.S.C. § 1395dd (1988 ed. & Supp. III 1991); 42 C.F.R. §§ 482.12(a), (c), (f), 482.22(b), 482.55(a)(2), (b) (1992); N.Y.Pub. Health Law § 2805–b(1) (McKinney Supp.1992); and N.Y.Comp. Codes R. & Regs. tit. 10, §§ 405.2(f), 405.7(b)(4), (14) (1988);

(2) adequate nursing services, in violation of 42 C.F.R. §§ 482.12(a), (c), 482.22(b), 482.23 (1992); and N.Y.Comp. Codes R. & Regs. tit. 10, §§ 405.3(b)(5), 405.5 (1988);

(3) adequate preparation and administration of drugs, in violation of 42 C.F.R. § 482.23(c)(4) (1992);

(4) adequate dietary services, in violation of 42 C.F.R. § 482.28(b) (1992);

(5) a clean and safe physical environment, in violation of 42 C.F.R. §§ 482.41, 482.42 (1992); and N.Y.Comp. Codes R. & Regs. tit. 10, § 405.7(b)(3) (1988);

(6) adequate information about their diagnoses, treatment, and prognoses, in violation of N.Y.Comp. Codes R. & Regs. tit. 10, § 405.7(b)(6), (8)—(11), (14) (1988); and

(7) adequate plans for discharge and post-hospital follow-up care, in violation of 42 C.F.R. § 482.21(b) (1992); and N.Y.Pub. Health Law § 2803–i(1), (3)(a) (McKinney Supp.1992); and N.Y.Comp. Codes R. & Regs. tit. 10, § 405.9(f) (1988).

As relief, plaintiffs seek a judicial declaration that:

(1) Kings County Hospital fails to "provide necessary, adequate, and timely care pursuant to the statutes and regulations cited;"

(2) the State defendants have failed in their duty to ensure that the Hospital provides "necessary, adequate, and timely care pursuant to the statutes and regulations cited;"

(3) the Hospital's failure to provide emergency room care "in accordance with acceptable standards of practice" and to permit family members or companions to stay with patients seeking emergency care violates federal and state laws;

(4) the Hospital's failure (a) to provide patients with "nursing care that is adequate to meet [their] needs ... in accordance with nursing practices," (b) "to provide nursing aides, housekeeping services, and other ancillary support services sufficient to meet patient care needs and to prevent adverse impacts on the delivery of medical and nursing care," and (c) "to establish and maintain working relationships among medical staff, nursing staff, and staff of other departments or services to assure that all patients' needs are met" violates federal and state laws;

(5) the Hospital's failure "to prepare and administer drugs in accordance with accepted standards of practice" violates federal law;

(6) the Hospital's failure "to provide adequate dietary services to patients, including assistance in eating for those who need it," violates federal law;

(7) the Hospital's failure "to provide a clean and safe environment that ensures the well-being and safety of patients" and to maintain "an active program to avoid sources and transmission of infections and communicable diseases" violates federal and state law;

(8) the Hospital's failure to provide patients with "complete, current information about their diagnoses, treatment, and prognoses, and consequent failure to provide adequate information" to give informed consent to treatment violates federal and state law; and

(9) the Hospital's failure "to provide effective discharge planning" to facilitate "ade-

---

**2.** In their briefs opposing the City defendants' motion to dismiss, plaintiffs further cite to 42 U.S.C. § 1395z (1988). The court considers this section as well as § 1396a in its discussion of plaintiffs' statutory rights claims. *See infra* Part III.

quate follow-up care" violates federal and state law.

Plaintiffs ask the court to issue an injunction ordering defendants "to provide necessary, adequate, and timely care" to patients at Kings County Hospital; "to establish and implement an effective plan to insure that [patients] receive and continue to receive necessary, adequate, and timely care at Kings County Hospital pursuant to law;" and to appoint a special master to evaluate the proposed plan, make recommendations to the court as to the steps necessary to ensure that patients receive "necessary, adequate, and timely care at Kings County Hospital," and then to monitor implementation of the plan.

### D. The Hospital's History of Problems Providing Health Care

Concern with the level of care afforded by Kings County Hospital did not originate with plaintiffs' lawsuit. Since 1986, surveys of the Hospital conducted by the State Department of Health, the New York agency responsible for monitoring institutions participating in the State's Medicare and Medicaid plans, have noted serious deficiencies. The 1989 survey found that Kings County Hospital failed to comply with Medicaid eligibility requirements in a number of areas: (1) physical environment, (2) quality assurance, (3) medical staff, and (4) emergency services. Although the hospital did endeavor to correct most of the cited deficiencies, the Health Care Financing Administration of HHS insisted that the State Department of Health closely monitor the Hospital's proposed plan of correction.

In January 1991, the State Department of Health again declared Kings County Hospital out of compliance with Medicaid standards. Fifty-six pages of deficiencies were cited, including inadequacies in the Hospital's Departments of Medicine, Pediatrics, Rehabilitation Medicine, and Orthopedics. Errors in the administration of medication and failures in the maintenance of patient charts, the sanitization of equipment, and the dietary assessment of high-risk patients were among the myriad of problems noted. On March 19, 1991, HHS advised the Hospital that because

the state survey revealed it to be out of compliance with 42 C.F.R. §§ 482.12 (regarding its governing body), 482.21 (regarding quality assurance), 482.22 (regarding medical staff), 482.41 (regarding physical environment), and 482.55 (regarding emergency services), it was being terminated from further participation in the Medicaid program, effective May 19, 1991. The Hospital was, however, given the opportunity to apply for a re-survey before the termination date if it "corrected the deficiencies."

A re-survey, conducted on April 11–19, 1991 by the State Department of Health, revealed that the Hospital had achieved "Condition level compliance" with respect to the defects in its governing body, its quality assurance, its medical staff, and its emergency services. Accordingly, on May 8, 1991, HHS rescinded its earlier order of termination, permitting the Hospital "to correct the remaining deficiencies in accordance with a plan of correction" to be submitted to the State Department of Health. Because the Hospital had been unable to sustain compliance with federal standards in the period between 1989 and 1991, HHS did require it to remain subject to periodic reviews of its eligibility for federal funds.

In the summer of 1991, the City of New York, confronted with serious budget problems, proposed cutting $89.2 million from the funds allocated to its Health and Hospitals Corporation. Among the services at Kings County Hospital to be reduced were inpatient nursing, housekeeping, maintenance, and dietary controls. More significantly, the budget cuts would require the Hospital to eliminate its walk-in clinics and evening and weekend outpatient clinics, which relieved pressure on the heavily-burdened emergency room. Defendant Bernard Rose, in deposition testimony in this case, acknowledged that at then-current funding levels, the Hospital was struggling to comply with applicable federal and state health care standards. With the proposed cuts, it would "be very difficult" for the Hospital to maintain compliance.

Plaintiffs in this action therefore sought a preliminary injunction barring the City defendants from implementing the budget cuts

at Kings County Hospital. After numerous conferences and, at the court's request, a review of the effects of the budget cuts on health care services by the State Department of Health, the matter was resolved informally.[3] Plaintiffs nevertheless submit that the specter of budget cuts only aggravates the problems at issue in this lawsuit.

Later in 1991, Kings County Hospital was the subject of further public criticism. A special investigation, ordered by New York City Mayor David Dinkins after a number of patients died at the hospital, criticized "miscommunication, mismanagement, and chaos" at the Hospital. *See* Lisa Belkin, *More Suspicious Deaths Cited at Brooklyn Hospital,* N.Y. Times, Nov. 6, 1991, at B3; Mitch Gelman & Gale Scott, *Special Counsel: Hospital Gravely Ill,* Newsday, Nov. 6, 1991, at 8. The State Department of Health also noted a host of problems, ranging from residents working longer hours than allowed by law, doctors performing procedures for which they had not been certified, nurses failing to notify doctors of important changes in patients' conditions, and staff failing to conduct proper diagnostic tests. *See* Lisa Belkin, *Disorder Involved in Deaths at Kings County, Study Says,* N.Y. Times, Nov. 8, 1991, at B3.

In April 1992, the Joint Commission on Accreditation for Health Care Organizations, a private group that annually reviews more than 5,000 of the nation's hospitals, gave Kings County Hospital only a conditional accreditation. While certain areas of performance, including emergency services, apparently passed inspection, others were criticized for inadequate internal controls. *See* Lisa Belkin, *Lincoln Fails After Review of Hospitals,* N.Y. Times, April 16, 1992, at B2.

Most recently, in December 1992, yet another commission appointed by Mayor Dinkins released a report suggesting reforms of the City Health and Hospitals Corporation itself. Specifically, the report recommends a strengthening of the powers of both the Board of Directors of the Health and Hospi-

tals Corporation and the executive directors of individual hospitals, and an expansion of the cooperative relationship between the City's hospitals and various medical schools. *See* Mitch Gelman, *HHC Reform Urged,* Newsday, December 8, 1992, at 25.

### Discussion

The legal issue before this court is simply stated: can a class of patients eligible for Medicaid assistance maintain a cause of action under § 1983 against these City defendants for alleged deficiencies in the standard of care afforded at Kings County Hospital, an accredited health care provider under New York's approved Medicaid plan. The issue arises, of course, in a disturbing and complex factual context: (1) Kings County Hospital is an institution that daily strains to cope with a staggering number of medical demands; (2) it is unlikely that the Hospital could survive without Medicaid funds; (3) no party thinks that the community would benefit from the closing of the Hospital; (4) in recent years, the Hospital has either fallen short of, or barely satisfied, various federal, state, and private standards of care; and (5) federal and state agencies and private entities have regularly surveyed the Hospital and repeatedly cautioned administrators about perceived deficiencies.

### I. Preclusive Effect of Accreditation

The City defendants submit that dismissal of this action is appropriate because the continued accreditation of Kings County Hospital by the Joint Commission on Accreditation of Health Care Organizations necessarily evidences compliance with Medicaid's standards of care. *See Concerned Citizens for Creedmoor, Inc. v. Cuomo,* 570 F.Supp. 575, 576 (E.D.N.Y.1983). The court is not persuaded that accreditation by the Joint Commission is determinative. Although courts generally accord considerable deference to the findings of the Joint Commission, its accreditation serves only as "prima facie" evidence of compliance with Medicaid stan-

---

**3.** The court has not been as successful in helping the parties move toward a settlement of the entire case. A suggestion that the City defendants meet with plaintiffs' representatives to discuss constructive proposals for improving health care services at Kings County Hospital was rejected out of hand by the City's Corporation Counsel.

dards. A plaintiff may still rebut this showing of compliance by specific evidence to the contrary. *See Woe v. Cuomo,* 729 F.2d 96, 106–07 (2d Cir.), *cert. denied,* 469 U.S. 936, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984). In this case, where plaintiffs have cited specific deficiencies in their complaint, where it is undisputed that the Hospital has long struggled to meet the standards set for Medicaid providers, and where the Joint Commission's accreditation has been only "conditional," this court cannot say as a matter of law that no set of facts could be adduced to evidence noncompliance.[4]

II. *Section 1983 Actions to Enforce Statutory Rights: The Relevant Supreme Court Authority*

42 U.S.C. § 1983 provides a private cause of action against any person who under color of state law deprives another of "any rights, privileges, or immunities, secured by the Constitution and laws [of the United States]." Although the cause of action dates back over 120 years, originating in Section 1 of the Civil Rights Act of 1871, 17 Stat. 13 (commonly referred to as "the Ku Klux Klan Act"), it is only in the last fifteen years that litigants have invoked it as a vehicle to vindicate federal statutory, as opposed to constitutional, rights.

The Supreme Court's sanctioning of § 1983 actions based on statutory rights has not come without considerable debate. One need only look to the thoughtful discussions of the legislative history of § 1983 in the concurring opinions in *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), to understand how reasonable people might differ in their conclusions. Justice Powell's meticulous review of the statute's lineage leads him to find that "the phrase 'and laws' was intended as no more than a shorthand reference to the equal rights legislation enacted by [the Reconstruction] Congress." *Id.* at 625, 99 S.Ct. at 1920. On the other hand, Justice White's equally painstaking analysis supports his opinion that § 1983 applies to "all rights secured by federal statutes unless there is clear indication in a particular statute that its remedial provisions are exclusive or that for various other reasons a § 1983 action is inconsistent with congressional intent." *Id.* at 672, 99 S.Ct. at 1944.

The following year, the Court seemingly resolved the issue in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Focusing on the "plain language" of the "and laws" clause, it concluded simply that the statute "means what it says." *Id.* at 4–6, 100 S.Ct. at 2504–05. Its scope is not "limited to civil rights or equal protection laws." *Id.* at 6, 100 S.Ct. at 2505. Rather, it applies to "any right secured by any law of the United States." *Id.* at 7, 100 S.Ct. at 2505.

While it is thus beyond dispute that a § 1983 action can be maintained to vindicate purely statutory rights, the courts have continued to struggle with the question of what constitutes a statutory "right" and whether there are any limits to the cause of action. It is a debate that actively engages the Supreme Court to this day and yields opinions sometimes difficult for lower courts to reconcile.

For example, in *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), the Court held that "rights" recognized by Congress in the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000 *et seq.* (1976 ed. & Supp. III 1979), were not enforceable under § 1983 because they were not express conditions for the receipt of federal funds. The Developmentally Disabled Act, like the Medicaid Act, provides financial assistance to the states to aid them in creating certain programs. Participating states are required (1) to submit a plan for the approval of the Secretary of HHS, 42 U.S.C. § 6009, and (2) to provide the Secretary with "satisfactory assurances that each program ... which receives funds from the State's allotment ... has in effect for each developmentally disabled person who receives services from or under the program a *habilitation* plan," 42 U.S.C. § 6011(a) (emphasis added).

---

**4.** The opinions in *Concerned Citizens* and *Woe* do not otherwise assist this court in resolving the issue before it since both these cases involved constitutional, rather than statutory, challenges to the health care being provided.

Congress spoke to the question of habilitation in the statute's "bill of rights," 42 U.S.C. § 6010, the section at issue in *Pennhurst.*

> Congress makes the following findings respecting the rights of persons with developmental disabilities:
>
> . . . .
>
> (2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.

42 U.S.C. § 6010(2).

Despite the fact that 42 U.S.C. § 6010(2) was labeled a "right," the Court held that it was not enforceable in a § 1983 action. Then–Justice Rehnquist, writing for the majority, explained that when Congress enacts legislation pursuant to its spending power, it creates a contract between itself and the participating states, and "in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* at 17. "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* The rights set forth in 42 U.S.C. § 6010 were simply not unambiguous conditions for the receipt of funds.

The Court further held that the terms used in articulating the "right"—"appropriate treatment" and "least restrictive" setting—were too general to serve notice to the states as to the obligations imposed, and, therefore, could not be deemed enforceable in a private action under § 1983. *Id.* at 24–25.

Soon thereafter, the Court recognized a further limitation: § 1983 actions based on statutory rights could not be maintained when Congress had itself provided in the statute for "remedial devices" so "comprehensive" as to demonstrate an intent to preclude private actions under § 1983. *Smith v. Robinson,* 468 U.S. 992, 1011–13, 104 S.Ct. 3457, 3468–69, 82 L.Ed.2d 746 (1984). *Middlesex County Sewerage Auth. v. National Sea Clammers Assn.,* 453 U.S. 1, 10–20, 101 S.Ct. 2615, 2621–27, 69 L.Ed.2d 435 (1981).

In *Wright v. Roanoke Redevelopment and Housing Auth.,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), however, the Court emphasized that not every administrative scheme for enforcement bars private actions under § 1983. In that case, plaintiffs were residents of federally-funded public housing projects who complained that they were being charged rent in excess of the 30% of income maximum set by 42 U.S.C. § 1437a (1982 ed. & Supp. III 1985). Although the Secretary of Housing and Urban Development (referred to herein as "HUD") was charged with supervising such housing projects and was, indeed, empowered to withhold funding from errant participants, the Court ruled that such administrative enforcement did not bar plaintiffs' suit. With minimal discussion, it held that 42 U.S.C. § 1437a was a mandatory limitation on the amount that a family could be charged for public housing and that Congress was undeniably intending to benefit tenants when it passed this legislation. *Id.* at 430, 107 S.Ct. at 773.

Justice O'Connor, joined by the Chief Justice and Justices Powell and Scalia in dissent, did not disagree with these conclusions. Where the Court split, however, was on the scope of the statutory right conferred. Plaintiffs claimed that public housing projects violated 42 U.S.C. § 1437a if they failed to comply with a HUD regulation requiring a "reasonable" amount for utilities to be included in calculating a tenant's rent. 24 C.F.R. § 860.403 (1982). The majority found that such regulations could indeed define an enforceable right because they have the force of law. *Id.* at 431, 107 S.Ct. at 774. Moreover, agency guidelines for establishing utility allowances protected against vagueness. *Id.* at 431–32, 107 S.Ct. at 774–75. The dissent, however, was troubled by recognition of a "right" with respect to utilities when nothing "[o]n the face of the statute" suggested that Congress intended the inclusion. *Id.* at 433–34, 107 S.Ct. at 775–76 (O'Connor, J., dissenting).

> I am concerned … that lurking behind the Court's analysis may be the view that, once it has been found that a statute creates some enforceable right, *any* regulation adopted within the purview of the

statute creates rights enforceable in federal courts, regardless of whether Congress or the promulgating agency ever contemplated such a result.

*Id.* at 438, 107 S.Ct. at 778 (emphasis in original). Moreover, the dissent found the guidelines cited by the majority for calculating reasonable utility rates too indefinite to permit judicial review. *Id.* at 438–39, 107 S.Ct. at 778–79.

Two years later, in *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), the Court endeavored to derive from these various cases a logical framework for analyzing § 1983 claims. A two-step formula was pronounced. In the first step, a court would have to decide if the case really involved a federal "right," as opposed to simply a claimed violation of federal law. On this first point, plaintiff would bear the burden. Among the factors pertinent to resolution of this issue would be (1) whether the statutory provision in question created obligations binding on the governmental unit as opposed to stating a congressional preference for certain conduct; (2) whether the interest plaintiff asserted was sufficiently specific and definite to be within the competence of the judiciary to enforce; and (3) whether the provision in question was intended to benefit the plaintiff. *Id.* at 106, 110 S.Ct. at 448. If a court were satisfied that plaintiff had asserted an enforceable right, the second step of the inquiry would require consideration of whether Congress had foreclosed its enforcement under § 1983. On this issue, defendant would bear the burden and would have to point to a remedial scheme so comprehensive that allowing plaintiff to sue under § 1983 would be inconsistent with Congress's carefully tailored scheme. *Id.* at 106–07, 110 S.Ct. at 448–49.

This formula, when applied in *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), led the Court to hold that Medicaid health care providers could sue state authorities pursuant to § 1983 to compel compensation for services rendered in accord with the "reasonable rate" standard articulated in the Boren Amendment to the Medicaid Act. 42 U.S.C. § 1396a(a)(13)(A). Because the statute made specific reference to various health care providers as the entities to which a reasonable rate was to be paid, the Court had "little doubt" that they were the "intended beneficiaries of the Boren Amendment." *Id.* at 510, 110 S.Ct. at 2517. Further, because the reasonable rate standard was "cast in mandatory rather than precatory terms: the state plan *'must'* 'provide for payment,'" the Court was satisfied that an obligation was actually imposed, as opposed to a mere preference stated. *Id.* at 512, 110 S.Ct. at 2518 (citations omitted) (emphasis in original). Although the four member dissent, led by the Chief Justice, argued that the only thing that was made mandatory by the Amendment was a state's obligation to make findings as to the reasonableness and adequacy of its rates and then to provide assurances to the Secretary, *id.* at 527–28, 110 S.Ct. at 2526–27 (Rehnquist, C.J., dissenting), the majority held that plaintiffs were entitled to pursue a broader right.

It would make little sense for Congress to require a State to make findings without requiring those findings to be correct....

. . . .

[T]he statute and regulation set out factors which a State must consider in adopting its rates.... That the Amendment gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the Amendment, but it does not render the Amendment unenforceable by a court. While there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act.

*Id.* at 514, 519–20, 110 S.Ct. at 2519, 2522–23 (emphasis in original).

Were *Wilder* the last word as to § 1983 actions to enforce statutory rights, this court would not have catalogued in such detail the Supreme Court's § 1983 statutory rights jurisprudence. It would have simply applied the two-prong test enunciated in *Golden State,* mindful of the expansive view of statutory rights recognized by the *Wilder* majori-

ty. The viability of that approach has, however, been put into question by the Supreme Court's decision in *Suter v. Artist M.*, — U.S. —, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), wherein seven members of the Court, led by the Chief Justice, held that private individuals could not sue under § 1983 to enforce a provision of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–628, 670–679a (1988 ed. & Supp. I 1988).

The Adoption Act is yet another federal funding statute. It reimburses states for expenses incurred in providing foster care and adoption services. To be eligible for funding, a state must submit the ubiquitous "plan" for approval by the Secretary of HHS. The statute lists sixteen requirements for state plans, including one providing that

> in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home.

42 U.S.C. § 671(a)(15). The *Suter* plaintiffs complained that officials at the Illinois Department of Children and Family Services failed to make such reasonable efforts, in large part because they failed promptly to assign caseworkers to children in their custody and promptly to reassign cases when caseworkers were on leave. The district and appellate courts, applying *Wilder*, agreed that plaintiffs could pursue their 42 U.S.C. § 671(a)(15) claim under § 1983. *Artist M. v. Johnson*, 726 F.Supp. 690 (N.D.Ill.1989), aff'd, 917 F.2d 980 (7th Cir.1990), rev'd sub nom. *Suter v. Artist M.*, — U.S. —, 112 S.Ct. 1360, 112 L.Ed.2d 1 (1992).

In holding to the contrary, the Supreme Court did not reverse *Golden State, Wright*, or *Wilder*. But neither did it apply the two-prong analysis recommended in those cases. Instead, the Chief Justice emphasized a point not heard since *Pennhurst*, namely, that when legislation is enacted pursuant to Congress's spending power, any conditions imposed on the grant of federal monies must be stated "unambiguously." *Id.* at —, 112 S.Ct. at 1366. At first glance this might not seem inconsistent with *Wright* and *Wilder*. But whereas those cases suggest that any provision that Congress mandates be a part of a plan necessary to receive funding is an unambiguous—and therefore privately enforceable—condition, *Suter* adopts a narrower approach. Returning to a theme prominent in the *Wilder* dissent, *Suter* highlights the importance of "examin[ing] exactly what is required of States" as conditions to the receipt of federal funds. *Id.* at —, 112 S.Ct. at 1367. It holds that the only unambiguous requirement of 42 U.S.C. § 671(a) is that "a State have a plan approved by the Secretary which contains the 16 listed features." *Id.* But the features themselves, particularly § 42 U.S.C. § 671(a)(15), are deemed too general to qualify as privately enforceable rights. *Id.* at —, 112 S.Ct. at 1370. Such "generalized dut[ies are] ... to be enforced not by private individuals, but by the Secretary." *Id.*

The dissent complains that the majority "by resurrecting arguments decisively rejected less than two years ago in *Wilder*, ... has changed the rules" with respect to § 1983 statutory rights claims.[5] *Id.* at —, 112 S.Ct. at 1377 (Blackmun, J., dissenting). En-

---

5. Some commentators have also found *Suter* and *Wilder* irreconcilable. *E.g.*, Leo Smith, Reducing State Accountability to the Federal Government: The *Suter v. Artist M.* Decision to Dismiss Section 1983 Claims for Violating Federal Funding Mandates, 1992 Wis.L.Rev. 1267; Martin A. Schwartz, Reviewing Federal Statutes Under § 1983, Revisited, N.Y.L.J., June 16, 1992, at 3. The tension between the two cases has not escaped Congress's attention. In the fall of 1992, legislation was proposed to reverse so much of *Suter* as held that the only enforceable requirement of a federal funding statute is that a state have an approved plan. *See* 138 Cong.Rec. S17,689–01 (daily ed. Oct. 8, 1992) (statement of Sen.

Riegle); 138 Cong.Rec. H12,227–01 (daily ed. Oct. 5, 1992) (text of amendment). The bill containing this provision was vetoed by President George Bush on November 4, 1992. *See President Vetoes Tax Bill, Saying Urban Aid was Outweighed by Special Interests*, 1992 Daily Rep. for Executives (BNA) 215 (Nov. 5, 1992) (text of President's veto message). The legislation seeking to overturn *Suter* has since been reintroduced in the Senate and is currently pending. *See* 139 Cong.Rec. S3,173–01 (daily ed. March 18, 1993) (statement of Sen. Riegle); 139 Cong.Rec. S2,917–03 (daily ed. March 16, 1993) (text of bill).

deavoring to distinguish *Wilder*, the majority notes that the "reasonable" rate requirement there at issue was supplemented by other provisions of the statute and regulations that "set forth in some detail the factors to be considered in determining the methods for calculating rates." *Id.* at ——, 112 S.Ct. at 1368. By contrast, "[n]o further statutory guidance is found as to how 'reasonable efforts' [to maintain a child in or return a child to his home] are to be measured." *Id.* The dissent remains unpersuaded, finding the statutory requirements in *Suter* indistinguishable from those in *Wilder*. *Id.* at ——, 112 S.Ct. at 1377.

### III. *Applying Relevant Law to this Case*

■ This court is, of course, bound by both *Suter* and *Wilder*. In considering the pending motion, it must endeavor to reconcile their holdings, as well as those from earlier § 1983 statutory rights cases. A few principles are discerned: (1) the two-prong test first articulated in *Golden State,* and not expressly repudiated by *Suter,* remains a useful tool in considering whether a private plaintiff can sue under § 1983 to enforce statutory rights; but (2) in applying this test, courts must look carefully at the precise language of any statute relied on by plaintiffs as the source of the right they seek to enforce; and (3) the right at issue must be unambiguously conferred by the statute.

Applying these principles to this case, the court begins by noting that, throughout their complaint, plaintiffs contend that defendants have failed to provide them with "necessary, adequate, and timely" health care. Indeed, they seek declaratory and injunctive relief framed in those broad terms. To the extent this is the "right" plaintiffs sue to enforce, the court must dismiss their action. No statute or regulation cited by plaintiffs makes reference—in either mandatory or precatory language—to "necessary, adequate, and timely care." Instead, this is a general, conclusory phrase used by plaintiffs to synthesize the requirements of various and sundry federal and state standards for Medicaid care. Such a sweeping approach to statutory rights is not sanctioned by *Wilder* and is expressly rejected by *Suter*. *Id.* at ——, 112

S.Ct. at 1367 & n. 8 (court must "examine exactly what is required of States" and "each statute must be interpreted by its own terms"). This court dismisses so much of plaintiffs' complaint as seeks relief in terms of "necessary, adequate, and timely care." *See Alexander v. Choate,* 469 U.S. 287, 303, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985) (rejecting argument that benefit conferred by Medicaid is the amorphous right to "adequate health care" in any given case).

That conclusion hardly ends the inquiry, for plaintiffs do point to a number of federal and state statutes and regulations that, in more particular terms, relate to the Medicaid program. The court examines these to determine if unambiguous rights are conferred vis-a-vis the City defendants. The court focuses on four statutory sections: 42 U.S.C. § 1396a(a)(9), (13), (19) (1988 ed. & Supp. III 1991), and 42 U.S.C. § 1395z (1988 ed. & Supp. III 1991).

■ Section 1396a(a)(9) does require a state's Medicaid plan to "provide" for a state agency to "be responsible for establishing and maintaining health standards for private or public institutions in which recipients of medical assistance under the plan may receive care or services." Logic dictates that the intended beneficiaries of such a requirement are the "recipients of medical assistance under the plan" expressly mentioned therein. *See Wilder v. Virginia Hosp. Ass'n,* 496 U.S. at 510, 110 S.Ct. at 2517 (express reference to health care providers in Boren Amendment supports finding that requirement imposed therein was for their benefit). Plaintiffs are such recipients. The requirement is, moreover, mandatory in that a state "must ... provide ... that the State health agency shall be responsible for establishing and maintaining health standards." 42 U.S.C. § 1396a(a)(9). In this case, there is no question that New York has designated its Department of Health for this purpose.

The crux of plaintiffs' complaint, however, is that the State Department of Health has not established, or more significantly, maintained standards of adequate care at Kings County Hospital. Whether or not this statutory requirement creates enforceable rights against the State defendants is not, however,

the issue before this court on this motion. It is the *City* defendants who move for dismissal. Nothing in § 1396a(a)(9) mandates any action by the City defendants. Thus, it cannot serve as the basis for a § 1983 statutory claim against these defendants. *See Suter v. Artist M.*, —— U.S. at ——, 112 S.Ct. at 1367 (court must look to "exactly" what is required in statutory language to determine scope of any right); *see generally Stowell v. Ives*, 976 F.2d 65, 69 (1st Cir.1992) (where statutory mandate is directed to one party (federal authorities), it is not enforceable against another (state)); *accord Resident Council of Allen Parkway Village v. HUD*, 980 F.2d 1043, 1053 (5th Cir.1993) (statutory directive to HUD not enforceable against City housing authority).

■ Plaintiffs further cite 42 U.S.C. § 1396a(a)(13), the Boren Amendment, as a source of their statutory rights claim. This provision does state a congressional mandate. *See Wilder v. Virginia Hospital Assoc.*, 496 U.S. at 512, 110 S.Ct. at 2518.

A State plan for medical assistance must—

. . . .

(13) provide—(A) for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates ... which the State finds, and makes reasonable assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....

42 U.S.C. § 1396a(a)(13). Plaintiffs urge the court to focus exclusively on the phrase "efficiently and economically operated facilities ... in conformity with applicable State and Federal laws, regulations, and quality and safety standards" in support of their contention that any federal or state law, regulation, or standard applicable to Medicaid health care providers is a federally-enforceable statutory right. The court rejects this approach. The phrase relied upon cannot be divorced from the actual mandate that it modifies.

The plain language of the Boren Amendment simply does not impose any requirement *on* Medicaid providers. Congress's mandate is directed exclusively *to* the states and pertains to the means by which they set reimbursement rates *for* Medicaid providers. Thus, as the Supreme Court held in *Wilder*, it is providers who are the beneficiaries of the Amendment. It is they who can invoke § 1983 to enforce a state's statutory duty to set rates at a level reasonable and adequate to permit them to operate consistently with their obligations under federal and state law. Obviously, the requirement imposed by Congress upon the states for setting reimbursement rates facilitates a provider's ability to meet its obligations under federal and state law, something that Congress undoubtedly wished to encourage. But that is not the same as legislating such compliance. The Boren Amendment simply cannot be parsed to support plaintiffs' argument that every federal and state law and regulation pertaining to Medicaid providers is a statutory right that patients can enforce against providers in a § 1983 action.

■ In their brief, plaintiffs also point to 42 U.S.C. § 1395z to support their contention that state regulations for Medicaid and Medicare providers are privately enforceable under § 1983. That statute requires the Secretary of HHS to consult with "appropriate State agencies and recognized national listing or accrediting bodies" in setting standards for hospitals participating in Medicaid and Medicare programs. The final sentence—emphasized by plaintiffs—provides that, "in the case of any State ... which imposes higher requirements on institutions ... under a State plan ... the Secretary shall impose like requirements as a condition to the payment for services ... in such institutions in such State." Plaintiffs argue that because providers are thus statutorily mandated to meet state standards as a condition for federal funding, such state standards are transformed into federally-enforceable statutory rights. The court is not persuaded.

42 U.S.C. § 1395z is directed to the Secretary of HHS, not to health care providers. *See Stowell v. Ives, supra, Resident Council*

*of Allen Parkway Village v. HUD, supra.* Moreover, § 1395z, as a whole, does not so much reflect an intent to turn state regulations into privately enforceable federal rights as it does an intent not to have federal regulations supersede stricter state ones for participating hospitals. Such deference to the states is consistent with Congress's express directive that Medicaid and Medicare not become vehicles for federal "supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. Neither did Congress intend federal authorities to exercise any direct "supervision or control over the administration or operation" of any health care institution. *Id.*

■ Not surprisingly then, the Secretary has carried out the directive in § 1395z (that compliance with state standards be a condition of federal funding) by promulgating a regulation requiring hospitals participating in Medicaid or Medicare programs to be "[a]pproved as meeting standards for licensing established by the agency of the State or locality responsible for licensing hospitals." 42 C.F.R. § 482.11(b)(2). In short, the Secretary carries out the requirement of § 1395z by leaving the enforcement of state standards to the states. So long as a participating hospital is licensed by the state in which it operates, it is eligible for federal funding under § 1395z. Such a scheme simply does not reflect an unambiguous congressional intent to give Medicare and Medicaid recipients a federally-enforceable right of action with respect to state standards of care.[6]

■ Finally, plaintiffs rely on § 1396a(a)(19), which requires state plans to provide "such safeguards as may be necessary" to assure that health care is provided "in a manner consistent with simplicity of administration and the best interests of the

recipients." By itself, the section would not support a statutory rights claim, for the terms "safeguards as may be necessary" and "best interests of the recipients" are too general and vague to permit judicial enforcement. *See Suter v. Artist M.,* —— U.S. at ——, 112 S.Ct. at 1370; *Pennhurst State Sch. Hosp. v. Halderman,* 451 U.S. at 24–25, 101 S.Ct. at 1543–44; *Fulkerson v. Commissioner, Maine Dep't of Human Serv.,* 802 F.Supp. 529, 534 (D.Me.1992) (Cohen, Mag. J.) (finding § 1396a(a)(30)(A) requirement that Medicaid plans provide methods for payment "consistent with efficiency, economy, and quality of care" too vague to be enforceable); *cf. Kam Shing Chan v. City of New York,* 803 F.Supp. 710, 725 (S.D.N.Y.1992) (Housing and Community Development Act requirement that laborers on federally funded projects be "paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis–Bacon Act," creates a sufficiently "unambiguous, specific benchmark" advising contractors "exactly what wage rates will need to be paid" to be enforceable under § 1983). But plaintiffs contend that § 1396a(a)(19) is given specific meaning—in much the same way as the "reasonable rate" requirement in *Wilder* was given meaning—by federal regulations that detail the standards of hospital care thought to be in the best interests of Medicaid recipients. *Cf. Suter v. Artist M.,* —— U.S. at ——, 112 S.Ct. at 1368 (absence of regulations defining vague statutory terms precludes private enforcement).

Once again, the court must reject plaintiffs' argument. Although the Medicaid regulations pertaining to hospitals, reported at 42 C.F.R. § 482.1 *et seq.,* are extensive, they were not promulgated to particularize patient rights privately enforceable under § 1983. 42 C.F.R. § 482.1(3)(b) specifically states

6. In any event, the vast majority of the state regulations cited by plaintiffs are too general to permit judicial enforcement. N.Y.Comp.Codes R. & Regs. tit. 10, § 405.1 *et seq.* (1988). For example, the requirement that every hospital patient "receive emergency health care that meets generally accepted standards of medical care," § 405.19(e)(1), necessarily turns on the facts of the particular patient's case. Similarly general are the requirements that a hospital respond "in

a reasonable manner to [a] patient's request for services customarily rendered by the hospital consistent with the patient's treatment," § 405.-7(b)(14), or that it provide "support services in a manner sufficient to meet patient care needs and to prevent adverse impact on the delivery of medical and nursing care," § 405.3(b)(5). These are only a few examples of state regulations that plaintiffs seek to enforce through a § 1983 action.

that the "scope" of these regulations is to "serve as the basis of survey activities for the purpose of determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid." An accredited hospital is generally considered to meet all of the conditions for participation in Medicare and Medicaid programs. 42 C.F.R. § 488.5 (1992). Nevertheless, the Health Care Financing Administration of HHS "may require a survey of an accredited hospital" to validate the findings of the accreditation process. Surveys are conducted on a random basis, but also "in response to substantial allegations of significant deficiencies." 42 C.F.R. § 488.6(a) (1992). In short, such surveys, and the regulations that pertain to them, are relevant to the *Secretary's consideration* of whether an accredited hospital qualifies for participation in a Medicaid or Medicare program.

It is worth noting that surveys are conducted by health care professionals designated by the state health care agency supervising the state's Medicaid plan. 42 C.F.R. §§ 488.10(a)(1), 488.26(b)(3) (1992). Although some of the standards articulated in 42 C.F.R. § 482.1 *et seq.* for surveyor consideration are specific, *e.g.*, § 482.12(c)(3) (doctor of medicine or osteopathy must be on duty or on call at all times); § 482.23(b)(3) (a registered nurse must supervise and evaluate the nursing care for each patient); § 482.-23(b)(4) (a nursing care plan must be developed and maintained current for each patient), others are quite general, *e.g.*, § 482.-23(b) (requiring "adequate numbers" of licensed registered nurses, licensed practical nurses, and other personnel to provide nursing care to all patients "as needed"); § 482.28 (requiring "organized dietary services" directed and staffed by "adequate qualified personnel").[7] Not surprisingly

then, surveyors are called upon to exercise their professional "judgment", in determining whether a hospital is in compliance with these standards. § 488.26(3). Judgments are reached, moreover, only after on site review of a hospital over a period of several days. Surveyors are required to conduct an "in-depth" review of the treatment afforded a representative number of patients, including first-hand observation of treatment, observation of the preparation and administration of drugs, and personal interviews. § 488.26(e). Surveyors are required to report any and "all deficiencies found during the survey." The Health Care Financing Administration then reviews the report to determine whether a provider may participate in a Medicaid program. § 488.12.

The fact that a hospital survey may reveal deficiencies with respect to one or more of the standards set forth in the federal regulations does not, however, mandate its exclusion from the Medicaid program. The regulations permit a hospital to submit a "plan of correction for achieving compliance within a reasonable period of time acceptable to the Secretary." § 488.28(a). Kings County Hospital operates pursuant to such a plan of correction.

The court does not cite to this survey scheme or the opportunity to submit a plan of correction to suggest that this constitutes a means of enforcing Medicaid standards so comprehensive as to bar Medicaid patients from suing under § 1983 to enforce statutory rights. The court need not reach this second prong of the *Golden State* test. Rather, the court cites the survey regulations to illustrate why plaintiffs have failed to demonstrate that there is any statutory right of the type enforceable under § 1983 here at issue. To summarize: (1) 42 U.S.C. § 1396a(a)(19),

7. As with the state regulations referred to in footnote 6, *supra,* the general nature of many of the federal standards cited by plaintiff is a further basis for rejecting them as a source of enforceable statutory rights. Plaintiffs seek to avoid this conclusion by arguing that courts have considerable experience applying general medical principles in malpractice actions. Malpractice actions, however, involve discrete challenges to specific treatment that has already occurred and presumably caused injury. Courts and juries are only required to evaluate that particular

treatment in light of reasonably accepted standards of medical practice. Here plaintiffs seek to involve the court in the overall evaluation and monitoring of countless treatment, personnel, and maintenance decisions affecting a major metropolitan hospital. In short, it is one thing to say that the court system is competent to address a malpractice claim based on a single incident of "inadequate nursing care." It is quite another to expect the court to define the boundaries of "adequate nursing care" for a hospital that treats tens of thousands of patients annually.

insofar as it requires states to provide safeguards to ensure that health care is consistent with the best interests of Medicaid patients, is by itself too vague to state an enforceable right; (2) 42 C.F.R. § 482.1 *et seq.*, setting standards for hospitals providing care to Medicaid patients, do not particularize § 1396a(a)(19) and thereby make each standard a right enforceable by Medicaid patients under § 1983 against participating hospitals; rather (3) § 482.1 *et seq.* serve the far more limited purpose of providing "the basis of survey activities" to assist federal officials in exercising *their* oversight responsibilities for hospitals operating under an approved state Medicaid plan.

Concededly, plaintiffs have amply demonstrated why federal and state officials have, over the years, closely surveyed Kings County Hospital and monitored its attempts to correct problems in the delivery of patient health care. What they have not done is pointed to an unambiguous statutory right that they may have to enforce under § 1983 any federal or state regulations pertaining to such hospitals. Accordingly, the City defendants' motion to dismiss is granted.

### Conclusion

Plaintiffs having failed to demonstrate that any section of the Medicaid Act relied upon by them unambiguously confers an enforceable statutory right as against the City defendants, the motion of the City defendants to dismiss plaintiffs' § 1983 claim is hereby granted.

SO ORDERED.