6 F.3d 519
 42 Soc.Sec.Rep.Ser. 362, Medicare&Medicaid Guide P 41,659
ARKANSAS MEDICAL SOCIETY, INC.; Independent Living Resource
Center, Inc., Mainstream Living; Mahlon O. Maris, M.D.;
Arkansas Disability Coalition; Arkansas Association of Home
Health Agencies, Inc.; Phyllis Henry; Michael Finan, M.D.;
Betty Parker, Mother and Guardian of Barbara Parker;
Barbara Parker; Arkansas State Dental Association; Lester
M. Stizes, III, D.D.S.; Arkansas Adapt; Arkansas
Speech-Language-Hearing Association, Inc.; American
Physical Therapy Association, Arkansas Chapter; Arkansas
Chiropractic Association; Arkansas Podiatric Medical
Association, Appellees,
v.
Jack REYNOLDS, Director, Department of Human Services, State
of Arkansas, Appellant.
 Nos. 92-3146, 93-2352.
 United States Court of Appeals,
Eighth Circuit.
 Submitted July 23, 1993.
Decided Sept. 10, 1993.
 
 Debby Thetford Nye, Little Rock, AR, for appellant.
 David L. Ivers, Little Rock, AR (Michael W. Mitchell, on brief), for appellees.
 Before FAGG, Circuit Judge, PECK,* Senior Circuit Judge, and MAGILL, Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 In this 42 U.S.C. Sec. 1983 action, we consider whether the Arkansas Department of Human Services violated 42 U.S.C. Sec. 1396a(a)(30)(A) by failing to consider whether proposed reimbursement rate reductions to Medicaid providers were consistent with efficiency, economy, and quality of care and whether the rate cuts would affect Medicaid recipients' access to health care services. Concluding that the agency's action did violate the Medicaid statute, we affirm the decision of the district court.[1]
 
 I. BACKGROUND
 
 2
 Medicaid is a cooperative federal/state program through which the federal government grants funds to participating states to provide health care services to needy individuals. See 42 U.S.C. Sec. 1396; Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990). State participation in Medicaid is voluntary, but if states choose to participate, they must comply with the requirements outlined in the Medicaid statute. Wilder, 496 U.S. at 502, 110 S.Ct. at 2513. To qualify for federal funds, a state must submit a plan to the Secretary of Health and Human Services (HHS) which complies with fifty-eight subsections outlined in 42 U.S.C. Sec. 1396a(a). Id. The state plan must include a system of reimbursing costs incurred by health care providers in providing services to Medicaid recipients. Id.
 
 
 3
 On June 24, 1992, the Arkansas Department of Human Services (DHS) issued an emergency rule cutting reimbursement rates to noninstitutional[2] Medicaid providers effective July 1, 1992. The rule mandated a 20% across the board cut in reimbursement rates in order to offset a $60 million shortfall in the state's Medicaid budget.
 
 
 4
 The plaintiffs/appellees in this case are three individual Medicaid providers, seven professional associations, two individual Medicaid recipients, and three disability associations who advocate the rights of Medicaid recipients. For ease of identification, they will be collectively called the Medicaid providers. The defendant/appellant in this action is the Director of DHS, the agency which administers Medicaid in Arkansas. The appellant will be referred to as DHS.
 
 
 5
 The Medicaid providers brought suit in the district court under 42 U.S.C. Sec. 1983 alleging that DHS had deprived them of federal rights by violating the Medicaid statute, specifically, 42 U.S.C. Sec. 1396a(a)(30)(A). This particular section of the Medicaid statute and its corresponding regulation at 42 C.F.R. Sec. 447.204 require states to ensure that Medicaid recipients have access to medical care that is at least equal to that of the general population. This feature of the Medicaid law is typically called the equal access provision. The Medicaid providers sought a preliminary and permanent injunction, declaratory judgment and other relief.
 
 
 6
 After a hearing on July 20, 1992, the district court issued a verbal order enjoining DHS from implementing the 20% reduction in reimbursement rates with respect to obstetrical and pediatric care, and speech, physical and occupational therapy for children, pending a trial on the merits. The cut in reimbursement rates to noninstitutional providers of other services remained in effect. The district court held a second hearing on August 18-19, 1992, regarding the other services, but declined to extend the injunction. On September 14, 1992, DHS appealed from the preliminary injunction in No. 92-3146.
 
 
 7
 The district court then held a final hearing from November 30 to December 3, 1992. At the final hearing, DHS announced that it had withdrawn its portion of the plan that attempted to apply the 20% reimbursement rate reduction in obstetrics and pediatrics. DHS asserted that the issue was now moot with respect to those two specialties.
 
 
 8
 The district court combined the evidence from all three hearings, and on April 20, 1993, the court issued its final order, 819 F.Supp. 816. First, the district court rejected DHS's contention that the matter was moot with respect to obstetrics and pediatrics. Second, the district court held that DHS's reimbursement rate scheme was set solely on the basis of budgetary considerations, and without regard to the requirements of the federal Medicaid statute. Therefore, the district court concluded, DHS's plan was invalid under federal law. Because immediate invalidation of the reimbursement rates would have potentially severe detrimental effects on DHS and Medicaid recipients, the district court allowed DHS 120 days to establish a plan conforming with federal law.
 
 
 9
 DHS now appeals from that final decision of the district court in No. 93-2352. Because it applies to all services including obstetrics and pediatrics, the April 20, 1993, order rendered moot the preliminary injunction issued July 20, 1992. This court consolidated the appeals and addresses all issues raised.
 
 II. ANALYSIS
 A. Section 1983 Enforceability
 
 10
 The Medicaid providers have fashioned this lawsuit as a 42 U.S.C. Sec. 1983 action. This well-known statute allows plaintiffs to sue officials acting under color of state law for alleged deprivations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. Sec. 1983. As a threshold matter, we must determine whether this statute allows the Medicaid providers to sue in this particular situation.
 
 
 11
 Plaintiffs may use Sec. 1983 to enforce not only rights contained in the Constitution, but also rights that are defined by federal statutes. Maine v. Thiboutot, 448 U.S. 1, 6-8, 100 S.Ct. 2502, 2505-06, 65 L.Ed.2d 555 (1980). The question of what constitutes a "right," however, has been the subject of much judicial inquiry.
 
 
 12
 For example, in Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), the Court held that certain purported "rights" defined by Congress in the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. Secs. 6000-6083, were not enforceable because they were not express conditions for the receipt of federal funds. The Court wrote that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." Pennhurst, 451 U.S. at 17, 101 S.Ct. at 1540. In the Developmentally Disabled Assistance Act, the terms used to articulate the "right" were too general and vague to provide specific notice to states as to what obligations were actually imposed. Id. at 24-25, 101 S.Ct. at 1543-44. Rather, Congress's language in the statute was more in the nature of a preference for certain types of treatment for developmentally disabled individuals. Id. at 19-20, 101 S.Ct. at 1540-41. Accordingly, the Supreme Court held that because the statute did not establish with sufficient specificity what kinds of services states were required to provide, the statute did not create an enforceable "right" on behalf of the recipients.
 
 
 13
 In Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), the Supreme Court, incorporating ideas from Pennhurst and other cases from the 1980s,[3] established a framework for analyzing Sec. 1983 enforceability questions. The framework is really a two-step process. In step one, a court must decide whether the claim actually involves a violation of a federal right, as opposed to a violation of a federal law. Id. at 106, 110 S.Ct. at 448. For this first step, the plaintiff asserting the right has the burden. Id. Factors which bear on the resolution of this question include: (a) whether the statutory provision in question was intended to benefit the plaintiff; (b) whether the statute creates a binding obligation on the state government as opposed to merely expressing a congressional preference; and (c) whether the interest asserted by the plaintiff is sufficiently specific and definite as to be within the competence of the judiciary to enforce. Id.; see also Evelyn V. v. Kings County Hosp. Ctr., 819 F.Supp. 183, 192 (E.D.N.Y.1993). In the second step, the court must determine if Congress has foreclosed enforcement under Sec. 1983. Golden State, 493 U.S. at 106, 110 S.Ct. at 448. On this point, the defendant bears the burden and the inquiry focuses on whether Congress has provided a comprehensive and carefully tailored remedial scheme within the statute in question, so as to make enforcement under Sec. 1983 inconsistent. Id. at 106-07, 110 S.Ct. at 448-49; see also Evelyn V., 819 F.Supp. at 192.
 
 
 14
 In Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court had occasion to apply the Golden State analysis to the Medicaid statute. In Wilder, an association representing hospitals sued several Commonwealth of Virginia officials alleging violations of 42 U.S.C. Sec. 1983 because the Virginia Medicaid plan violated 42 U.S.C. Sec. 1396a(a)(13)(A) of the Medicaid statute. This provision, commonly known as the Boren Amendment, provides the following:
 
 
 15
 A State plan for medical assistance must--
 
 
 16
 ....
 
 
 17
 (13) provide--
 
 
 18
 (A) for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates ... which the State finds, and makes assurances satisfactory to the Secretary [of HHS], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality....
 
 
 19
 42 U.S.C. Sec. 1396a(a)(13)(A).
 
 
 20
 In the first step of the Golden State analysis, the Wilder Court addressed the first issue and concluded "[t]here can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment." Wilder, 496 U.S. at 510, 110 S.Ct. at 2517. As to the second issue of the first step, Wilder held that a binding obligation was imposed upon the states because the language of the Boren Amendment was "mandatory rather than precatory." Id. at 512, 110 S.Ct. at 2519. The Court noted the state plan "must" provide certain features and the Secretary of HHS "shall" withhold federal funds from noncomplying states. Id.; 42 U.S.C. Sec. 1396c. As to the final issue in the first step, the Wilder Court rejected the notion that the Boren Amendment was too vague and amorphous. Wilder, 496 U.S. at 519, 110 S.Ct. at 2522. The Court cited the specific factors Congress had outlined in the statute and the federal regulations and noted the "objective benchmark of an 'efficiently and economically operated facility'...." Id. Furthermore, the Court acknowledged that Congress gave states considerable discretion, and there could be a "range of reasonable rates," but concluded that the Boren Amendment language was nonetheless enforceable by the judiciary. Id. at 519-20, 110 S.Ct. at 2522-23. Accordingly, the Wilder Court found that the statute did provide a federal right.
 
 
 21
 As to the second step of the Golden State framework, the Court highlighted the defendant's heavy burden to show how Congress had foreclosed the Sec. 1983 remedy. Id. at 520-21, 110 S.Ct. at 2523. Then the Court noted "[o]n only two occasions have we found a remedial scheme established by Congress sufficient to displace the remedy provided in Sec. 1983." Id. at 521, 110 S.Ct. at 2523. (citing Sea Clammers, 453 U.S. at 13, 101 S.Ct. at 2622; Smith, 468 U.S. at 1010-11, 104 S.Ct. at 3467). Finally, after examining the Medicaid Act, the Court concluded that the statute did not foreclose Sec. 1983 relief. Wilder, 496 U.S. at 522, 110 S.Ct. at 2524.
 
 
 22
 Just last year, the Supreme Court addressed another Sec. 1983 case, Suter v. Artist M., --- U.S. ----, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). This case concerned the enforceability of a provision in the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. Secs. 620-628, 670-679a. The Supreme Court held that the Suter plaintiffs could not bring a Sec. 1983 action to enforce a statutory requirement that Illinois Department of Children and Family Services use "reasonable efforts" to prevent the need for removing a child from his home and to make it possible for the child to return home. Suter, --- U.S. at ----, 112 S.Ct. at 1370.
 
 
 23
 In this opinion, however, the Court did not proceed analytically as it had in recent precedents. While Suter did not reverse Golden State, Wilder, or Wright, it did not follow the Golden State two-step paradigm. See Stowell v. Ives, 976 F.2d 65, 68 (1st Cir.1992); Evelyn V., 819 F.Supp. at 193. Nor did the Supreme Court replace the Golden State framework with a different analytical model. Stowell, 976 F.2d at 68.
 
 
 24
 Rather, the Suter Court reemphasized the point of Pennhurst, "namely, that when legislation is enacted pursuant to Congress's spending power, any conditions imposed on the grant of federal monies must be imposed 'unambiguously.' " Evelyn V., 819 F.Supp. at 193 (citing Suter, --- U.S. at ----, 112 S.Ct. at 1366). The Suter Court noted that the Wright and Wilder opinions "took pains to analyze the statutory provisions in detail, in light of the entire legislative enactment, to determine whether the language in question created 'enforceable rights, privileges, or immunities within the meaning of Sec. 1983.' " Suter, --- U.S. at ----, 112 S.Ct. at 1367 (quoting Wright, 479 U.S. at 423, 107 S.Ct. at 770); see also Suter, --- U.S. at ----, 112 S.Ct. at 1367 n. 8 ("[O]ur holding today ... counsels that each statute must be interpreted by its own terms."). The Court noted further that the Adoption Assistance and Child Welfare Act, unlike the Medicaid statute, did not give sufficient detail about what constituted "reasonable efforts." Suter, --- U.S. at ----, 112 S.Ct. at 1368. According to the Court, the statute's only real requirement was that the state submit a plan to the Secretary of Health and Human Services that contained the requisite features broadly outlined in the Act. Id. at ----, 112 S.Ct. at 1369. The states had discretion to provide the particular details of those broad features. Id. Because of the lack of specificity and detail in the legislation, the "reasonable efforts" language did not create a right enforceable by Sec. 1983. Id. at ----, 112 S.Ct. at 1370.
 
 
 25
 For the purposes of our analysis, we note the following. First, Suter did not create an analytical framework to replace Golden State. Second, Suter did not overrule Wilder. Third, Suter placed great emphasis on the fact that rights must be "unambiguously" conferred to be enforceable. And fourth, Suter emphasized that each statute must be examined on its own basis.
 
 
 26
 Accordingly, although some commentators have found Suter and Wilder difficult to reconcile,[4] we choose to synthesize the two cases by proceeding with the two-step Golden State analysis used in Wilder, bearing in mind the additional considerations mandated by Suter. This approach is consistent with the two other federal cases that have attempted to harmonize Suter and Wilder. See Stowell, 976 F.2d at 68 ("[W]e think it is much too early to post epitaphs for Wilder and its kin.... [W]e believe that it is both prudent and possible to synthesize the teachings of Suter with the Court's prior precedents, [and] we examine appellants' claims under the Wilder framework as reconfigured by the neoteric principles announced in Suter."); Evelyn V., 819 F.Supp. at 194.
 
 
 27
 Our analysis in this case is greatly simplified by the Wilder opinion. Although focusing on a different subsection, Wilder addressed the same statute facing us in this case. Suter urges a careful scrutiny of the exact legislation at issue and Wilder has already done that. Furthermore, the equal access provision is very analogous to the Boren Amendment examined in Wilder; they are similar not only in function but also in the specific language employed. See Illinois Hosp. Ass'n v. Edgar, 765 F.Supp. 1343, 1349 (N.D.Ill.1991) ("Section 1396a(a)(30) appears to complement the Boren Amendment....").
 
 
 28
 For the first step of the Golden State framework, determining whether a federal right is provided in the statute, we must initially decide whether the plaintiffs are the intended beneficiaries of the equal access provision. The provision states:
 
 
 29
 A State plan for medical assistance must--
 
 
 30
 ....
 
 
 31
 (30)(A) provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.
 
 
 32
 42 U.S.C. Sec. 1396a(a)(30)(A).
 
 
 33
 The plaintiffs in this case include both Medicaid providers and Medicaid recipients as well as organizations whose purposes are to promote the interests of each group. The equal access provision is indisputably intended to benefit the recipients by allowing them equivalent access to health care services. The question of whether the Medicaid providers are intended beneficiaries is also easily resolved. Wilder concluded that institutional providers were intended beneficiaries of the Boren Amendment because the Amendment concerned their reimbursement. Wilder, 496 U.S. at 510, 110 S.Ct. at 2517. Similarly, the equal access provision addresses payment for "care and services" provided by noninstitutional providers. The providers here are beneficiaries for the same reason that the providers in Wilder were beneficiaries. Moreover, this court, prior to Wilder, had determined that "Medicaid service providers" could enforce compliance with the Medicaid laws. Nebraska Health Care Ass'n v. Dunning, 778 F.2d 1291, 1295 (8th Cir.1985), cert. denied, 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987). Furthermore, at least one district court has held explicitly that the equal access provision grants a right in favor of health care providers. Oklahoma Nursing Home Ass'n v. Demps, 792 F.Supp. 721, 727 (W.D.Okla.1992). For all these reasons, we conclude that the plaintiffs are intended beneficiaries of the equal access provision and the first requirement is satisfied.
 
 
 34
 As to the second issue in the first prong, we find that there is sufficient mandatory language in the statute to create a binding obligation on the state. The equal access provision and the Boren Amendment are both introduced by the compulsory language "[a] State plan for medical assistance must...." 42 U.S.C. Sec. 1396a. This language is not merely precatory, it is imperative. Additionally, as discussed in Wilder, 42 U.S.C. Sec. 1396c stipulates, using mandatory language, that if the Secretary of HHS finds that a plan "no longer complies with the provisions of section 1396a of this title; or ... that in the administration of the plan there is a failure to comply substantially with any such provision; the Secretary shall notify such State agency that further payments will not be made to the State...." 42 U.S.C. Sec. 1396c; Wilder, 496 U.S. at 512, 110 S.Ct. at 2518.[5] Just as with the Boren Amendment, the equal access language "sets forth a congressional command which is wholly uncharacteristic of a mere suggestion or 'nudge.' " Wilder, 496 U.S. at 512, 110 S.Ct. at 2519 (citations omitted).
 
 
 35
 Mindful of the Court's language in Suter urging examination of the "entire legislative enactment" and "the context of the entire Act," Suter, --- U.S. at ----, ----, 112 S.Ct. at 1367, 1370, we find further evidence of the equal access provision's mandatory nature in the legislative history and context of the statute. In 1989, Congress determined that the equal access provision, which up until that time had been contained only in federal regulations, was receiving inadequate enforcement. See H.R.Rep. No. 101-247, 101st Cong., 1st Sess. 389-90 (1989), reprinted in 1989 U.S.C.C.A.N. 2060, 2115-16. Accordingly, Congress decided to place this provision directly into the legislation. As stated in the House Report:
 
 
 36
 The Committee Bill would codify, with one clarification, the current regulation, 42 C.F.R. 447.204, requiring adequate payment levels. Specifically, the Committee bill would require that Medicaid payments for all practitioners be sufficient to enlist enough providers so that care and service are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.
 
 
 37
 H.R.Rep. No. 101-247, 101st Cong., 1st Sess. 390 (1989), reprinted in 1989 U.S.C.C.A.N. 2060, 2116 (emphasis added). This decision to place the equal access provision in the text of the Medicaid statute to highlight its importance not only reinforces our conclusion that the provision is mandatory in nature, it also helps to indicate Congress's unambiguous conferring of a right to the beneficiaries.
 
 
 38
 The final issue in the first step is to examine whether the statute's language is too vague and amorphous to enforce a right via Sec. 1983. DHS argues that the term "general population" is a vague standard for comparing access. According to DHS, it is unclear whether that term refers to the entire population or just the insured population, and therefore the language is too amorphous as to be judicially enforceable. We disagree for three reasons.
 
 
 39
 First, to construe the language "general population" to include the uninsured members of the population would be directly contrary to the intent of the Medicaid statute. The Medicaid system is designed to ensure that qualifying individuals have adequate access to medical care. Uninsured individuals have very limited, if any, access to medical care. To suggest that Congress appropriated vast sums of money and enacted a huge bureaucratic structure to ensure that recipients of the federal Medicaid program have equivalent access to medical services as their uninsured neighbors (i.e., close to none) is ridiculous. Congress must have meant that Medicaid recipients are entitled to access equal to that of the insured population.
 
 
 40
 Second, this logical interpretation is completely supported by the legislative history and regulations surrounding the statute. Because the term "general population" is theoretically susceptible to DHS's reading, it is somewhat ambiguous. To resolve an ambiguous statute, courts may examine legislative history. See Toibb v. Radloff, --- U.S. ----, ----, 111 S.Ct. 2197, 2200 (1991). The House Budget Committee Report clearly states that the Secretary of HHS should "compare the access of beneficiaries to the access of other individuals in the same geographic area with private or public coverage...." H.R.Rep. No. 101-247, 101st Cong., 1st Sess. 390 (1989), reprinted in 1989 U.S.C.C.A.N. 2060, 2116 (emphasis added). Also, as the court in Clark v. Kizer, 758 F.Supp. 572, 576 (E.D.Cal.1990), aff'd, 967 F.2d 585 (9th Cir.1992), pointed out, HHS regulations measure compliance by comparing Medicaid recipient access with access of the insured population. See, e.g., Department of Health, Education and Welfare, Handbook of Public Assistance Administration, Supplement D: Medical Assistance Programs (1966-67) Part 7-5340.
 
 
 41
 Third, other courts who have examined the language of the equal access provision have found it sufficiently specific to be enforceable by Medicaid providers. See Orthopaedic Hosp. v. Kizer, No. 90-4209, 1992 WL 345652 at * 2 (C.D.Cal. Oct. 5, 1992); Ohio Hosp. Ass'n v. Ohio Dep't of Human Servs., 62 Ohio St.3d 97, 579 N.E.2d 695, 698 (1991), cert. denied, --- U.S. ----, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992); Illinois Hosp. Ass'n, 765 F.Supp. at 1349; Clark, 758 F.Supp. at 575-79.
 
 
 42
 In Fulkerson v. Commissioner, Me. Dep't of Human Servs., 802 F.Supp. 529 (D.Me.1992), the district court specifically found that the provision in the statute ensuring equal access with the general population was sufficiently specific, citing the Clark opinion. Id. at 534. However, the Fulkerson court concluded that the provision requiring payments consistent with "efficiency, economy, and quality of care" was not specific enough to allow enforceability under 42 U.S.C. Sec. 1983, citing no authority. Id. at 534-35. We disagree with the Fulkerson court on this point because of the Wilder opinion.
 
 
 43
 In Wilder, the Supreme Court found the language of the Boren Amendment, which is arguably more nebulous than the language of the equal access provision, sufficiently specific to be enforceable under Sec. 1983. The Boren Amendment talks about "reasonable access," and nowhere in the statute is that term defined. Wilder, 496 U.S. at 507, 110 S.Ct. at 2516. The equal access provision, by contrast, actually gives a measuring rod for accessibility which, as discussed above, is sufficiently specific. Both provisions contain almost identical language about efficiency, economy, and quality of care. The Wilder Court found that such language provided an "objective benchmark," id. at 519, 110 S.Ct. at 2523, and we must agree. Both subsections leave room for states to use their discretion, but as noted in Wilder, such discretion does not place the language outside the competence of the judiciary to enforce. Id. at 520, 110 S.Ct. at 2523.
 
 
 44
 For all of the foregoing reasons, we finish the first prong of the Golden State analysis by concluding that the equal access provision does involve a federal right. Through our explication, we are also satisfied that we have remained faithful to the Court's admonition in Suter to find a right that is unambiguously conferred.
 
 
 45
 As to the second prong of the Golden State test, we need go no further than the Wilder opinion. The Wilder Court found that Congress had not foreclosed Sec. 1983 enforcement in the Medicaid statute, Wilder, 496 U.S. at 520-23, 110 S.Ct. at 2523-24, and we are bound by that judgment. Therefore, the second step has been satisfied as well, and the equal access provision may be enforced by Medicaid recipients and providers using 42 U.S.C. Sec. 1983.
 
 B. Standing, Abstention, Mootness
 
 46
 DHS also advances three other jurisdictional arguments, all of which are easily resolved.
 
 
 47
 The first contention is that the associations that are among the plaintiffs in this case lack standing. The Supreme Court in Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), established a three-part test for associational standing. An organization has standing to sue on behalf of its members when (1) its members would have standing to sue in their own right, (2) the association is seeking to protect interests that are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Id.
 
 
 48
 The professional associations and the Medicaid recipients organizations advancing this action meet the three-part test. First, Medicaid recipients and providers individually have standing to contest the Medicaid laws. See Wilder, 496 U.S. at 509, 110 S.Ct. at 2517 (holding Medicaid providers have an enforceable right); Hodgson v. Board of County Comm'rs, 614 F.2d 601, 606 n. 7 (8th Cir.1980) (citing with approval district court case upholding standing of Medicaid patients, physicians, and medical clinics); Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare, 602 F.2d 150, 152 n. 6 (8th Cir.1979) (holding Medicaid providers have standing to challenge alleged violations of Social Security laws). Second, the organizations, through this lawsuit, are obviously seeking to protect interests that are directly relevant to the organizations' purposes.
 
 
 49
 Finally, the resolution of this case does not require the participation of individual association members. It is alleged that DHS violated the equal access provision. The gravamen of the Medicaid providers' complaint is that DHS reduced the reimbursement rates for purely budgetary reasons and did not consider the factors of equal access, efficiency, economy, and quality of care called for in the statute. As the district court noted, in determining whether DHS has complied with the equal access provision, the court considers DHS's actions prior to the rate reductions, and examines state-wide statistics including average participation and reimbursement rates that can easily be supplied by the organizations. Arkansas Medical Soc'y v. Reynolds, 834 F.Supp. 1097, 1100-01 (E.D.Ark.1992); see also Clark, 758 F.Supp. at 576. Individual participation by association members is not necessary for this type of scrutiny. Furthermore, the plaintiffs seek injunctions, a declaratory judgment, and other prospective relief. These types of relief have been recognized as legitimate goals for litigation brought by representative organizations in Warth v. Seldin, 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975), and do not require the participation of individual members. Accordingly, the organizations do have standing.
 
 
 50
 DHS's second argument is that the district court should have abstained under the doctrine of Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). "Burford abstention applies when a state has established a complex regulatory scheme supervised by state courts and serving important state interests, and when resolution of the case demands specialized knowledge and application of complicated state laws." Bilden v. United Equitable Ins. Co., 921 F.2d 822, 825 (8th Cir.1990). In general, abstention is " 'an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.' " Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (quoting County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)). DHS has not demonstrated that there is such a complex, established administrative scheme to address the rights of Medicaid providers. Furthermore, the Medicaid laws are routinely interpreted by federal courts and no specialized knowledge of state law is required. Abstention was not appropriate in this case.
 
 
 51
 Finally, DHS argues that its decision to withdraw the 20% reduction in obstetrical and pediatric services prior to trial renders the issue moot with regard to those specific services. We disagree. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). While a case may still be rendered moot if the defendant is able to demonstrate that "there is no reasonable expectation that the wrong will be repeated," the defendant's burden is "a heavy one." Steele v. Van Buren Pub. Sch. Dist., 845 F.2d 1492, 1494 (8th Cir.1988) (citations omitted). In this situation, DHS reserves the right to set reimbursement rates, and DHS has clearly not met its burden of showing that a reduction will not be repeated. This aspect of the case is therefore not moot.
 
 C. Violation of the Equal Access Provision
 
 52
 The Medicaid providers allege that DHS has violated their rights under 42 U.S.C. Sec. 1983 because DHS did not comply with the substantive requirements of the equal access provision. Specifically, the Medicaid providers contend that in cutting reimbursement rates to noninstitutional sources by 20%, DHS did not consider the relevant factors of equal access, efficiency, economy, and quality of care and thereby violated the statute.
 
 
 53
 The parties are in agreement that the challenged action involves state agency rate-making as opposed to adjudication. In reviewing DHS's rate-making decision, we must decide whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). An agency acts arbitrarily and capriciously if it fails to "consider whether the decision was based on a consideration of the relevant factors." Id. at 416, 91 S.Ct. at 824; American Paper Inst. v. American Elec. Power Serv. Corp., 461 U.S. 402, 413, 103 S.Ct. 1921, 1928, 76 L.Ed.2d 22 (1983). Review under the arbitrary and capricious standard is narrow, and a court may not substitute its judgment for that of the agency. Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). While it is a deferential standard of review, the agency must still articulate a "rational connection between the facts found and the choice made," Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983), and this court must engage in a "substantial inquiry." Citizens to Preserve Overton Park, 401 U.S. at 415, 91 S.Ct. at 823. Our review of the state plan must include "a determination whether the [state] plan complies with the requirements of federal law." Illinois Health Care Ass'n v. Bradley, 776 F.Supp. 411, 417 (N.D.Ill.1991) (citation omitted), aff'd, 983 F.2d 1460 (7th Cir.1993).
 
 
 54
 Again, we take direction from the Wilder decision to determine the relevant factors that DHS must consider. In Wilder, the Court found that the Boren Amendment contained a substantive requirement ("the adoption of reimbursement rates that are reasonable and adequate to meet the costs of an efficiently and economically operated facility") which state agencies had to meet in order to submit a valid plan. Wilder, 496 U.S. at 510, 513-15, 110 S.Ct. at 2517, 251920. The relevant factors to consider, therefore, were whether the rates were reasonable and adequate as required by the statute. The Wilder Court determined that the Virginia agency had not acted to ensure reasonable and adequate rates. Many other federal courts have also found state plans that failed to meet the requirements outlined in the Boren Amendment to be invalid. See, e.g., Temple Univ. v. White, 941 F.2d 201 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992); AMISUB (PSL), Inc. v. Colorado Dep't of Social Servs., 879 F.2d 789 (10th Cir.1989), cert. denied, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990); Nebraska Health Care Ass'n, 778 F.2d 1291; Missouri Health Care Ass'n v. Stangler, 765 F.Supp. 1413 (W.D.Mo.1991).
 
 
 55
 We agree with the trial court's conclusion that the relevant factors that DHS is obliged to consider in its rate-making decisions are the factors outlined in 42 U.S.C. Sec. 1396a(a)(30)(A). As already discussed, the equal access provision provides an unambiguous and compulsory framework to guide substantive agency decisions regarding reimbursement rates for noninstitutional providers. The statute requires that the reimbursement rates are sufficient "to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. Sec. 1396a(a)(30)(A). The purpose of this subsection is to ensure adequate access and quality of care in the context of noninstitutional Medicaid providers, just as the purpose of the Boren Amendment is to ensure adequate access and quality of care in the context of institutional providers. Moreover, the language in the two subsections closely parallel each other. Accordingly, DHS must consider the relevant factors of equal access, efficiency, economy, and quality of care as designated in the statute when setting reimbursement rates.
 
 
 56
 Two recent decisions from other jurisdictions confirm that these are the relevant factors. In Ohio Hosp. Ass'n v. Ohio Dep't of Human Servs., the Supreme Court of Ohio affirmed a lower court ruling that the ODHS "violated the statute by adopting the rule due to its own budgetary constraints and by failing to consider the rule's effect on efficiency, economy, and the quality of care." Ohio Hosp. Ass'n, 579 N.E.2d at 697. The court also acknowledged the influence of the Wilder decision by stating: "The same reasons relied on by the United States Supreme Court in Wilder support a decision that ODHS violated section 1396a(a)(30)(A) by basing its decision solely on budgetary concerns." Id. 579 N.E.2d at 698. Similarly, in Orthopaedic Hosp. v. Kizer, the court treated "efficiency, economy, and quality of care" as the relevant factors and then asked whether the relevant factors were considered in the agency decision-making. Orthopaedic Hosp., 1992 WL 345652 at * 3. The district court concluded that Medicaid rate-setting methodology at issue violated 42 U.S.C. Sec. 1396a(a)(30)(A) because it largely failed to consider the relevant factors. Id. at * 12-13.
 
 
 57
 Our examination of the record in this case yields the same conclusion as these two precedents. DHS has offered no evidence to show that the relevant factors have been considered. DHS argues that it followed the requirements of the Arkansas Administrative Procedures Act, but such procedural compliance is not the same as substantive adherence to the requirements of the Medicaid statute. DHS contends that it considered reimbursement rates for providers in other states. DHS has not shown, however, how such a comparison has any bearing on equal access, efficiency, economy, and quality of care in Arkansas. Furthermore, DHS admitted in a letter dated July 6, 1992, that "[a]ny studies in regard to the cuts on providers that goes into effect July 1 for example, the effect cuts will have on accessibility ... [do] not exist according to our records." Pl.'s Ex. 57. The only evidence offered during the hearings regarding the rate cuts' effect on accessibility was purely speculative and could only be confirmed by historical data accumulated after the cuts were made. Tr. of Nov. 30, 1992, Hr'g at 364-68.
 
 
 58
 Indeed, there is ample evidence suggesting that the reimbursement rate reductions were overwhelmingly based on budgetary concerns. The public explanation for the rate cuts was exclusively budgetary. The press release announcing the cuts stated explicitly: "The proposed change in reimbursement rates is due to budgetary constraints." Pl.'s Ex. 55. Moreover, the director of the DHS Division of Economic and Medical Services testified that the cuts were for budgetary reasons. Tr. of July 20, 1992, Hr'g at 40, 337, 340. In its own brief, DHS admitted that it "would not have made the reduction in rates but for the need to balance the budget." Def.'s Reply to Pl.'s Posttrial Br. at 14.
 
 
 59
 Abundant persuasive precedent supports the proposition that budgetary considerations cannot be the conclusive factor in decisions regarding Medicaid. See, e.g., AMISUB, 879 F.2d at 800-01; Alabama Nursing Ass'n v. Harris, 617 F.2d 388, 396 (5th Cir.1980); Friedman v. Perales, 668 F.Supp. 216, 221 (S.D.N.Y.1987), aff'd, 841 F.2d 47 (2d Cir.1988); Michigan Hosp. Ass'n v. Babcock, 736 F.Supp. 759, 764 (W.D.Mich.1990); Illinois Hosp. Ass'n v. Illinois Dep't of Pub. Aid, 576 F.Supp. 360, 368 (N.D.Ill.1983); Thomas v. Johnston, 557 F.Supp. 879, 914 (W.D.Tex.1983). DHS may take state budget factors into consideration when setting its reimbursement methodology. See Illinois Hosp. Ass'n, 576 F.Supp. at 371. However, the state may not ignore the Medicaid Act's requirements in order to suit budgetary needs. Id. (citing Alabama Nursing Ass'n, 617 F.2d 396). Given all the evidence, we must agree with the district court's conclusion that budgetary reasons were the guiding force and the relevant factors did not in any way form the basis for DHS's rate-making decision. Because it failed to consider the rate reduction's impact on equality of access, efficiency, economy, and quality of care, DHS's decision violated the requirements of 42 U.S.C. Sec. 1396a(a)(30)(A).
 
 III. CONCLUSION
 
 60
 Based on the foregoing, the decision of the district court is affirmed.
 
 
 
 *
 THE HONORABLE JOHN W. PECK, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation, took part in oral argument, subsequent conferences of the panel, and concurred in this opinion prior to his death on September 7, 1993
 
 
 [1]
 The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas
 
 
 [2]
 The Medicaid statute differentiates between institutional Medicaid providers which include hospitals, nursing facilities, and intermediate care facilities for the mentally retarded, see 42 U.S.C. Sec. 1396a(a)(13)(A), and noninstitutional providers which include individual physicians, professional associations, and other providers, see 42 U.S.C. Sec. 1396a(a)(30)(A)
 
 
 [3]
 These cases include Wright v. Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); and Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)
 
 
 [4]
 See Evelyn V., 819 F.Supp. at 193 n. 5
 
 
 [5]
 We are aware that this mandatory language is directed towards the Secretary of HHS, who, of course, is a federal not a state official. This distinction was important to the court in Stowell, 976 F.2d at 69. However, it is not important here because the operative effect of this section is to underscore the mandatory nature of the state plan requirements by expressly prohibiting the Secretary's discretion to approve funds for state provisions that do not conform to federal law