# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3262

_____

| | | |
|---|---|---|
| John Smith, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Jessie K. Rasmussen, in her official | * | |
| capacity as Director of the Iowa | * | |
| Department of Human Services, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 14, 2000

Filed: May 4, 2001

_____

Before WOLLMAN, Chief Judge, BEAM, Circuit Judge, and PANNER,[1] District Judge.

_____

WOLLMAN, Chief Judge.

The Iowa Department of Human Services (the Department or State) appeals from the district court's judgment that the Department violated the mandates of Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (1992 & Supp. 2000) (Medicaid

_____

[1]The Honorable Owen M. Panner, United States District Judge for the District of Oregon, sitting by designation.

Act or Act), when it refused to fund surgery for the plaintiff, John Smith (pseudonym). We reverse.

**I.**

Smith, now 41 years old, was born with the physiology of a female. He[2] suffers from the psychiatric condition "gender identity disorder," which,[3] when severe, equates with what is popularly known as transsexualism. Dr. Sharon Satterfield, Smith's primary treating psychiatrist and a specialist in gender identity disorder, has determined that sex reassignment surgery (essentially a transition from female to male physical features) is the necessary treatment for Smith. This transformation involves several different surgical procedures, hormonal treatment, and psychological counseling. Smith has already undergone the surgery for breast reduction and contouring. At this stage, Smith seeks payment from the Department for the final surgical procedure, which is a phalloplasty, the creation of a body part that simulates a penis. The Department's administrator of the division of medical services, Donald Herman, testified at trial that the State's Medicaid program covers psychotherapy and medication prescribed for

---

[2]As did the parties during the proceedings in the district court, we will refer to Smith, in accordance with his preference, by using masculine pronouns.

[3]Diagnostic Criteria for Gender Identity Disorder
A. A strong and persistent cross-gender identification (not merely a desire for any perceived cultural advantages of being the other sex).
B. Persistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex.
C. The disturbance is not concurrent with a physical intersex condition.
D. The disturbance causes clinically significant distress of impairment in social, occupational, or other important areas of functioning.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 537-38 (4th ed. 1994) (manifestations omitted).

psychiatric conditions such as gender identity disorder, but that surgical procedures are not covered. The Department has funded procedures for Smith, such as a hysterectomy, that were medically necessary for diagnosed conditions other than his gender identity disorder.

Medicaid is a federal-state program through which the federal government provides funds for the provision of health care services to needy individuals through the participation of the states, which act as administrators of the funds. 42 U.S.C. § 1396; Arkansas Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 521 (8th Cir. 1993). States are not required to participate in the Medicaid program, but if they do they must comply with the requirements of the Medicaid Act and its regulations. Reynolds, 6 F.3d at 522. "Although [the Medicaid Act] does not require States to provide funding for all medical treatment falling within . . . categories [of medical services], it does require that state Medicaid plans establish 'reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [the Medicaid Act].'" Beal v. Doe, 432 U.S. 438, 441 (1977) (quoting 42 U.S.C. § 1396a(a)(17) (1970)). Once a state decides to provide certain optional medical services, it is bound to act in compliance with the statute and its applicable regulations, which include the requirement that each service be "sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b) (2000); see Weaver v. Reagen, 886 F.2d 194, 197 (8th Cir. 1989).

The Medicaid Act defines "medical assistance" as "payment of part or all of the cost of [enumerated] care and services. . . . " 42 U.S.C. § 1396d(a). As a general matter, a state may choose which enumerated services to provide, but some services are mandated for most categories of needy persons who receive services under the plan. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a); 42 C.F.R. § 440.220. As the Seventh Circuit has stated, under the Medicaid Act "[there are essentially] three categories of potential recipients--the 'categorically needy,' the 'medically needy,' and those whose need is determined in relation to the poverty level." Addis v. Whitburn, 153 F.3d 836, 838 (7th

Cir. 1998). A state plan must provide for medical assistance to the categorically needy, but the state may choose whether to provide services to those persons within the classification of medically needy, who "do not qualify for some forms of federal assistance but who nonetheless lack the resources to obtain adequate medical care." Hodgson v. Board of County Comm'rs, County of Hennepin, 614 F.2d 601, 606 (8th Cir. 1980). Once a state elects to provide optional services, it is bound to act in compliance with statutory sections and regulations in the implementation of those services. Meyers v. Reagan, 776 F.2d 241, 243 (8th Cir. 1985).

Smith is within a covered "medically needy" classification of Medicaid recipients, but the Department refused payment for a phalloplasty because the procedure is excluded by a state regulation that prohibits funding for plastic surgery for certain purposes and which specifically excludes sex reassignment surgery. On May 19, 1997, Smith brought suit under 42 U.S.C. § 1983, alleging that the Medicaid Act provides an enforceable federal right to "reasonable standards" for the determination of the extent and scope of services that a state will provide and contending that the regulation that excludes funding for surgery for gender identity disorder is unreasonable and thus violates his right under the Act.

The Department does not dispute that Smith is eligible for coverage under the medically needy classification of Medicaid or that he is ready for the phalloplasty. The Department contends that Smith does not have an enforceable right under section 1983, that the district court erred in an evidentiary ruling that limited the testimony of its expert witness, and that the district court erred when it concluded that the application of the regulation violated Smith's right. Assuming for the purposes of this case that Smith has an enforceable federal right, we reverse the district court's judgment because the Department's regulation does not violate that right.

## II.

We first address the Department's argument regarding the district court's evidentiary ruling. At trial, the Department offered the expert testimony of Dr. Randall A. Kavalier. The district court limited Dr. Kavalier's testimony to general psychiatric principles and basic diagnostic criteria by excluding those opinions he offered concerning the effectiveness and necessity of sex reassignment surgery in general and for Smith in particular. The district court found that Dr. Kavalier's testimony about gender identity disorder and the potential treatment options was unreliable because his opinion was based on an indiscriminate literature review and was beyond the scope of his expertise.

The Federal Rules of Evidence "grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993)). "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" Id. at 149 (quoting Daubert, 509 U.S. at 592) (alteration in original). A district court's determination of the reliability of a proposed expert's testimony is reviewed under an abuse-of-discretion standard. Id. at 158.

Dr. Kavalier is an experienced, board-certified general psychiatrist who has treated several patients with sexual disorders. Dr. Kavalier, however, had examined only one patient with gender identity disorder, that examination occurring some eight years prior to trial in this case, and had had limited contact with that patient. His opinion concerning treatment of Smith was founded on a literature review, a review of Smith's file, and two interviews with Smith. The district court concluded that Dr.

-5-

Kavalier lacked expertise in the specialized discipline of gender identity disorder and noted that the opinion he offered disagreed with sources he acknowledged to be respected medical sources on that condition. Thus, although the court accepted some of Dr. Kavalier's testimony, it concluded that his opinion regarding the treatment of gender identity disorder lacked a reliable basis.

We have found no abuse of discretion in the limitation of the testimony of witnesses who, although considered experts in certain areas, were not well-versed in the particular discipline relevant to their testimony. See Dancy v. Hyster Co., 127 F.3d 649, 651-52 (8th Cir. 1997); Gier v. Educational Serv. Unit No. 16, 66 F.3d 940, 943-44 (8th Cir. 1995); Watkins v. Schriver, 52 F.3d 769, 771 (8th Cir. 1995); Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 283-84 (8th Cir. 1995). Likewise in the present case, because Dr. Kavalier's testimony was based neither on his personal experience nor on his knowledge of the relevant discipline, we conclude that the district court did not abuse its discretion in limiting Dr. Kavalier's testimony to general principles and diagnostic criteria.

**III.**

Turning to the merits, we have held that "[t]he Medicaid statute and regulatory scheme create a presumption in favor of the medical judgment of the attending physician in determining the medical necessity of treatment." Weaver, 886 F.2d at 200; see Pinneke v. Preisser, 623 F.2d 546, 549 (8th Cir. 1980). At the same time, "Medicaid was . . . designed . . . to provide the largest number of necessary medical services to the greatest number of needy people." Ellis v. Patterson, 859 F.2d 52, 55 (8th Cir. 1988). The Act "confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." Beal, 432 U.S. at 444. A state must "specify the amount, duration, and scope of each service" that it provides and "may place appropriate limits on a service based on such criteria as medical

necessity or on utilization control procedures." 42 C.F.R. § 440.230. A provided service, however, must "be sufficient in amount, duration, and scope to reasonably achieve its purpose." Id. The Act and its regulations both protect and limit the states' discretion. Some "limitations on medically necessary services, such as the number of physician visits or in-hospital days, have been permitted as reasonable." Ellis, 859 F.2d at 55 (citations omitted); see Alexander v. Choate, 469 U.S. 287, 303 (1985).

As a preliminary matter, the Department argues that an enforceable right to reasonable standards would not require the State to use a standard of medical necessity in making funding determinations, as Smith argues. At oral argument, however, the Department's counsel admitted that the State had not changed its service coverage determination standards since our Pinneke decision, in which we concluded that "medical necessity" was implicitly the State's determinative standard. The Department has articulated no other standard (such as utilization controls) for the determination of the scope and extent of medical services provided in the program. Indeed, the Department has funded several surgical procedures for Smith based on their medical necessity for the treatment of conditions he suffers other than gender identity disorder and several treatments for his gender identity disorder other than surgery.

The district court considered itself bound by Pinneke and determined that the Department's regulation failed to meet the mandates of Medicaid, finding both procedural and substantive fault in the regulation. The Department argues that the district court erred in invalidating the regulation because both the legal and medical landscapes have changed since Pinneke.

In Pinneke, the Department's predecessor had developed an exclusionary policy precluding funding for surgeries such as Smith's but had not followed a formal rulemaking process, had not consulted medical professionals, and had disregarded the current accumulated knowledge of the medical community. Pinneke, 623 F.2d at 549-50. We required the State to fund the surgery because the record showed that the

-7-

procedure was the only medical treatment available to relieve or cure the plaintiff's condition, and thus the denial of funding based on a non-medical presumption, particularly one not promulgated through a proper rulemaking process, was arbitrary. Id. at 549. In contrast, here the Department has followed a rulemaking process and has considered the knowledge of the medical community. We thus conclude that Pinneke is not outcome-determinative in this case.

The State's current regulation provides: "Cosmetic, reconstructive, or plastic surgery performed in connection with certain conditions is specifically excluded." 441 Iowa Admin. Code r. 78.1(4)(b). Procedures related to gender identity disorder are specifically excluded. 441 Iowa Admin. Code r. 78.1(4)(b)(2). We review the rule-promulgation actions of a state agency administering federal Medicaid funding as we would review non-adjudicatory federal agency action; that is, we decide whether the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Weaver, 886 F.2d at 197. This is a question of law that we review de novo.

In 1993, the Department contracted with the Iowa Foundation for Medical Care (the Foundation) to provide a review and recommendation regarding the coverage of treatment for disorders like gender identity disorder. The Foundation is a federally designated medical peer review organization that, among other things, monitors the quality of care and the appropriateness of certain medical procedures for payment under Medicare and Medicaid programs. Foundation personnel conducted a review of the medical literature and contacted various organizations, including the National Institute for Mental Health and the Harry Benjamin International Gender Dysphoria Association. The Foundation reported a lack of consensus on definition, diagnosis, and treatment and referred to post-Pinneke research that indicated that hormone treatments, psychotherapy, and situational treatment may be more appropriate, and at times more effective, than sex reassignment surgery. The literature also revealed that the surgery

-8-

can be appropriate and medically necessary for some people and that the procedure was not considered experimental. The final recommendation for the Department, prepared by a Foundation review committee consisting of physicians of various specialties, was that, given the lack of consensus in the medical community and the availability of other treatment options, the Department should not fund sex reassignment surgery.

Following the receipt of the Foundation's report, the Department commenced a rulemaking process by publishing a notice of intended action that included a mention of fiscal concerns and a lengthy discussion of the medical literature and which solicited public comment.[4] The notice also included the results of a 1994 survey of state Medicaid agencies that the State had conducted in order to determine what coverage other states provided regarding sex reassignment surgery. Of the forty-four state agencies that responded to the Department's survey, thirty-six stated that they did not fund the surgery. Several of the eight agencies that stated that they did fund the surgery added a caveat that a recipient must first meet certain medical prerequisites and/or obtain prior authorization.[5] The proposed regulation was thereafter considered at a public meeting of the Department's policy-making body and then reviewed by the administrative rules committee of the state legislature. The regulatory exclusion was then adopted. Although, as the district court pointed out, it might have been helpful or prudent for the State to have sought opinions from medical professionals with experience in the treatment of gender identity disorder, the Department promulgated the regulation through a rulemaking process that involved professional medical judgment and the consideration of the current state of medical knowledge.

---

[4]The only comment received in response to the notice was that from Smith's current counsel.

[5]The Department performed a similar survey in 1998 during this litigation that showed that of the forty-seven states that responded, forty, including Minnesota, now do not provide coverage for sex reassignment surgery.

Accordingly, we cannot say that these procedures were problematic, unreasonable, or inadequate.

In the light of the evidence before the Department questioning the efficacy of and the necessity for sex reassignment surgery, given other treatment options, we cannot conclude as a substantive matter that the Department's regulation is unreasonable, arbitrary, or inconsistent with the Act, which is designed to provide "necessary medical services to the greatest number of needy people," Ellis, 859 F.2d at 55, in a reasonable manner. See Weaver, 886 F.2d at 200; Beal, 432 U.S. at 444. "Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs," as long as the care and services that the states provide "are provided in the best interests of the recipients." Alexander, 469 U.S. at 303 (internal quotation marks omitted). As described above, the Department's research demonstrated the evolving nature of the diagnosis and treatment of gender identity disorder and the disagreement regarding the efficacy of sex reassignment surgery. Additionally, Herman, the Department's administrator, testified to the fiscal concerns inherent in the choice of which services to provide and stated that the State had access to literature indicating that Medicare refuses to cover this surgery. Although Dr. Satterfield's testimony generally supports the conclusion that sex reassignment surgery may be medically necessary in some cases, it is not as unequivocal an endorsement of the surgery as Smith argues. Indeed, Dr. Satterfield's testimony noted that the efficacy of the surgery has been questioned within the medical community. Accordingly, we conclude that the State's prohibition on funding of sex reassignment surgery is both reasonable and consistent with the Medicaid Act.

Finally, we briefly consider 42 C.F.R. § 440.230(c), cited by the district court, which prohibits an arbitrary denial of coverage based on diagnosis, type of illness, or condition. Smith cites the regulation broadly, but we note that, by its own terms, it applies solely to 42 C.F.R. §§ 440.210 and 440.220, which list required services for

the classifications of categorically needy and medically needy, respectively. The Department points out that the categories of required services for medically needy persons do not include those that would be required for sex reassignment surgery, <u>see</u> 42 C.F.R. § 440.220, and Smith has not attempted to persuade us otherwise. We conclude, therefore, that the State regulation does not conflict with the contours of section 440.230(c). Indeed, "[p]articipating States that elect to extend coverage to the 'medically' needy . . . have the option of providing somewhat different categories of medical services to those individuals [than are required for categorically needy individuals]." <u>Beal</u>, 432 U.S. at 440 n.2.

The Department's rulemaking process has resulted in a reasonable regulation that overcomes the presumption in favor of the determination of Smith's treating psychiatrist. <u>See</u> <u>Weaver</u>, 886 F.2d at 200. Accordingly, the judgment is reversed, and the case is remanded with directions to dismiss the complaint.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-